In re PETTERS COMPANY, INC., et al., Debtors.

(includes: Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc., Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtor Petters Company, Inc., Plaintiff,

v.

Michael J. Hofer; CHW, LLC; HGH, LLC; Hofer Financial Services, LLC; Hofer Financial Ventures, LLC; Mikarhof Corporation; Imaging Solutions, Inc.; ISMS Capital, LLC; and Quality Growth, Inc., Defendants.

Bankruptcy Nos. 08–45257, 08–45258 (GFK), 08–45326 (GFK), 08–45327 (GFK), 08–45328 (GFK), 08–45329 (GFK), 08–45330 (GFK), 08–45331 (GFK), 08–45371 (GFK), 08–45392 (GFK).

Adversary No. 10–4221.

United States Bankruptcy Court, D. Minnesota.

Dec. 20, 2010.

[black box]

James A. Lodoen, Jeffrey D. Smith, Lindquist & Vennum P.L.L.P, Minneapolis, MN, for Debtors.

## ORDER DENYING DEFENDANTS' MOTION FOR TRANSFER TO DISTRICT COURT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding is one among 200–plus commenced by the Plaintiff, in his capacity as trustee in the bankruptcy cases of Debtors Petters Company, Inc. ("PCI"), Petters Group Worldwide, LLC, and their related entities. It is part of a so-called "clawback" effort, undertaken to redress what is alleged to have been a large-scale Ponzi scheme that left 3.5 billion dollars or more in unsatisfied creditors' claims after its collapse. (In early October, 2008, the key person in the underlying businesses—Thomas J. Petters—was arrested and charged federally, and his business entities ceased operations.)

The term "clawback" is an unfortunate feature of current legal-journalistic jargon, coarse and not too illuminative of the trustee's underlying mission. Via "clawback," a trustee or receiver puts all parties that transacted with the purveyor of a failed Ponzi scheme onto a parity in the matter of restitution. This would be done by invoking remedies of avoidance (under theories of fraudulent transfer, unjust enrichment, and the like) against those lenders and investors who got repaid in whole or in part before the collapse. The extant wreckage of the scheme, i.e., the property that had remained in-hand with the purveyor as of the collapse, would be augmented by recoveries of funds from those lenders and investors who got out early. The identity of parties subject to the trustee's claims would be fixed by a temporal measurement, as those that had been paid during the periods of vulnerability to avoidance or recovery specified by the law of fraudulent transfer or other invoked remedies. Those with debts unsatisfied at the downfall would share pro rata with those whose claims would perforce be revived via the avoidance of the payments to them and the recovery from them of corresponding amounts of money.

This is one such action, styled under Minnesota's enactment of the Uniform Fraudulent Transfers Act, Minn.Stat. §§ 513.44–.47 (made available as a remedy to the Plaintiff by 11 U.S.C. § 544); a claim of "Unjust Enrichment/Equitable Disgorgement"; and other pleaded theories of recovery. The Defendants are identified as related entities. They are alleged to have separately engaged in a total of "at least 86 separate note transactions" with PCI, i.e., lendings purportedly in aid of PCI's "diverting business," i.e., purchase-and-resale of large lots of consumer electronic goods.

The total of the transactions between PCI and the Defendants is alleged to have been "in a principal sum of at least $24,380,000," but to have resulted in "payments or other transfers totalling at least $36,278,748 to or for the benefit of [the] Defendants." The spread between these two numbers is characterized as "False Profits," i.e., a spurious margin inflated by unusually high rates of interest and resulting from a contrivance, the stated difference between acquisition and sale prices for transactions in goods that were never contracted or closed in reality. From his investigation, the Plaintiff concluded that this practice was essential to the multi-year maintenance of the alleged fraud, and was ubiquitous in the operation. The Plaintiff seeks a recovery from the Defen-

dants, in an amount equal to either the aggregate amount of the transfers to them, i.e., $32 million-plus, or (in the alternative) the total of the "False Profits," nearly $12 million.

On November 15, 2010, the Court heard a motion by six of the nine named Defendants,[1] through which they sought the transfer of this adversary proceeding to the United States District Court for this district pursuant to Fed. R. Bankr.P. 9015 and Loc. R. Bankr.P. (D. Minn.) 5011–3. The movants appeared by their attorney, Lowell P. Bottrell. The Plaintiff appeared by his attorney, George H. Singer.

This motion is the first document filed by the movants in response to the Plaintiff's complaint. The movants broadly assert a right to trial by jury, on the ground that "this action against [them] is founded in Minnesota's enactment of the Uniform Fraudulent Transfer Act." They do not consent to a bankruptcy judge presiding over a jury trial; so, they demanded that this adversary proceeding be transferred to the district court immediately. The Plaintiff opposed the request, on several grounds.

 The Court denied the motion from the bench. This order is entered to me-morialize the two reasons for the denial, as follows. Both go to the prematurity of the motion, in its separate aspects.

*First*, judicially determining the movants' right to jury trial is not warranted on this state of the pleadings; in the abstract, the issue is not even ripe. The movants did not file an answer to the Plaintiff's complaint before they filed this motion. Literally, they had not yet taken issue, of record and via a pleading, with any of the Plaintiff's pleaded fact averments. As a result, it is not certain whether fact-finding will even be necessary, to get to a judicial resolution of the Plaintiff's requests for relief.[2]

Without a determination of whether fact-finding is necessary, the analysis cannot proceed to the constitutional dimension under the analysis in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), i.e., whether the Plaintiff's various requests for relief equated to "Suits at common law," within the Seventh Amendment's meaning.[3] The possibility of a judgment on the pleadings alone must be laid to rest before a motion like this one is made; and that would be done only when fact disputes were joined in the first instance by responsive pleading.[4]

---

1. Namely, Michael J. Hofer; CHW, LLC; HGH, LLC; Hofer Financial Services, LLC; Hofer Financial Ventures, LLC; Mikarhof Corporation; Imaging Solutions, Inc.; ISMS Capital, LLC; and Quality Growth, Inc. Defendants CHW, LLC; Hofer Financial Services, LLC; and ISMS Capital, LLC have not yet appeared in this adversary proceeding.

2. Yes, it is rare to have a civil federal lawsuit plead its way mutually and directly to determination as a matter of law on a motion for judgment on the pleadings, with a complete concord on pleaded facts. But if this adversary proceeding assumed that posture, there would be no need for a trial, let alone one conducted to a jury. At a trial, the province of a jury would be fact-finding on contested evidence, to resolve a genuine dispute of

fact(s) material to the claims or defenses in suit. *In re Fulda Ind. Co-op.*, 130 B.R. 967, 977 (Bankr.D.Minn.1991) ("Ultimately, the right to a jury trial is only a right to the adjudication of disputed fact issues by a particular tribunal....").

3. This was done, for instance, in *In re Mathews*, 203 B.R. 152 (Bankr.D.Minn.1996); and, in a different procedural context, in *In re A.P.I., Inc.*, 324 B.R. 761 (Bankr.D.Minn. 2005).

4. In the strictest sense, the issue may not fully ripen until even later. The movants' right to compel the convening of a jury trial on any of the Plaintiff's claims would activate only after bona fide contentions on facts were pleaded, *and* then survived a summary judgment pro-

*Second,* and more globally, the demand to transfer this litigation to another situs of judicial authority, the United States District Court, is premature. The basis for that observation is intertwined with the considerations just discussed; but it also implicates the fine details of the federal judicial system's structure.

This proceeding was commenced in one situs of judicial authority, the United States Bankruptcy Court, because it arises out of a case under the Bankruptcy Code that is pending in that forum. The *jurisdiction* over this adversary proceeding, however, reposes in the district court. 28 U.S.C. § 1334(b). A bankruptcy judge, as a judicial officer of the district court, 28 U.S.C. § 151, presides over it on reference from the district court, 28 U.S.C. § 157(a) and Loc. R. Bankr.P. (D. Minn.) 1070–1.[5]

In this district, a presiding bankruptcy judge has authority to conduct a jury trial, 28 U.S.C. § 157(e) and Loc. R. Bankr.P. (D. Minn.) 1070–1, and may do so "with the express consent of all of the parties," 28 U.S.C. § 157(e). Where, as here, "the parties have not consented to the bankruptcy judge conducting the jury trial," and when "the court has determined that there is a right to trial by jury of the issues for which a jury trial has been timely demanded," the bankruptcy judge is to transfer the proceeding to the district court. Loc. R. Bankr.P. (D. Minn.) 5011–3(a)(1).

In the text of their motion, the movants summarily asserted their entitlement to a jury trial, at least on the Plaintiff's fraudulent-transfer causes of action. They then demanded a jury trial on the *whole* adversary proceeding. Finally, they requested a "transfer [of] all matters to the United States District Court ...," to be effected immediately.

The movants did not explicitly ask for a judicial determination now, as to their right to a jury trial, but Local Rule 5011–3(a)(1) makes such an adjudication a prerequisite of transfer; thus, a request for that determination is implicit in their motion. In the end, though, the appropriateness of an immediate transfer can be addressed without determining the movants' substantive right to a jury trial on any or all of the Plaintiff's requests for relief.

In their insistence on immediacy, the movants have garbled the notions of jurisdiction and judicial authority.[6] Under the statutory structure summarized earlier, the mere making of a demand for a jury trial does not affect bankruptcy jurisdiction in any way. More to the point, the making of the demand does not in itself bear on judicial authority, in any sense; it does not affect the status of the judicial officer who is to preside over the ongoing litigation, the presentation of the dispute for decision as a matter of law, or a jury trial if there is an entitlement to one and the necessity for it. And, at a more func-

cess. As long as it had formally and timely staked out its demand in accordance with Fed. R. Bankr.P. 9015(b) and Fed.R.Civ.P. 38(b), a party could defer a motion for determination of its right to jury trial and for transfer to the district court until the exhaustion of a summary judgment process. *Harris v. Interstate Brands Corp.,* 348 F.3d 761, 762 (8th Cir.2003); *In re Fulda Ind. Co-op.,* 130 B.R. at 977–978, and authorities cited there (where disposition of claims in suit may be made via summary judgment under Rule 56,

right to jury trial under Seventh Amendment does not even come into play).

**5.** In turn, the bankruptcy court is a unit of the district court, comprised of the bankruptcy judges in regular active service. 28 U.S.C. § 151.

**6.** In citing decisions that identify "jurisdiction" as the cleaving line between the two judicial fora, and using that word in that sense in his argument, the Plaintiff's counsel did the same thing.

tional level, the movants misidentify the sort of "judicial economy" that is really relevant to their request. To alter the classic metaphor, their argument focuses on one seedling to ignore a whole surrounding tree farm.

Simply stated: this single adversary proceeding is only one piece of a very large project of dispute resolution, presented to the federal judicial system in this district by the response of the United States Department of Justice to large financial wrongdoing by Tom Petters. The project opened under the criminal jurisdiction of the U.S. District Court, via the lodging of felony charges against Petters and other persons. It quickly moved into the district court's civil jurisdiction; a receivership ancillary to the criminal process was commenced as a measure to contain and suspend further damage to putative victims, and to recapture assets for possible application to forfeiture and restitution during the criminal process. Then, the work moved into the bankruptcy jurisdiction, when the receiver elected to use the process and remedies of bankruptcy as the means to more broadly address and rectify the consequences of Petters's actions.

The criminal process took over a year and a half to get to final disposition on the trial-court level, i.e., conviction and sentencing. During that time, the receivership process focused on the identification, amassing, and liquidation of assets traceable to the individuals and companies under its direct administration. For a number of corporate entities in Petters's business structure—the two main holding companies and several others—the bankruptcy process was initiated.

Over its first two years, the bankruptcy process helped to stabilize and liquidate assets on-hand. Litigation was commenced to resolve claims to the assets' value. Much analysis was directed to identifying further avenues to address the main goal of bankruptcy, a ratable distribution of value to aggrieved creditor-claimants that were entitled to receive it. It was not until the criminal process was finalized, however, that a much broader issue, oriented to both process and result, came to the fore, spearheaded by the United States Department of Justice as the party that had invoked federal jurisdiction in the first place: where, and through what legal mechanisms, was a comprehensive process of restitution and recovery for *all* those harmed by the underlying wrongdoing to be completed?

This conundrum was faced in a long process of negotiation among the United States Department of Justice and the several stewards of receivership and bankruptcy alike. The result was a "Coordination Agreement" jointly approved by this court and the district court (Montgomery, J.) on September 14, 2010. The agreement was nominally among the parties to the pending civil matters, public and private, as well as the United States in the role of prosecutor and potential agent of forfeiture. It embodied a mutual judgment as to an acceptable means to make as many victims of a complex and long-running artifice as whole as possible, via a combination of structured legal processes.

Under the Coordination Agreement, the United States relinquished the administrative processes of civil and criminal forfeiture and remission as the means to remedy victims' losses, in favor of the court-supervised processes of bankruptcy and receivership that were already under way. The government forwent all right to invoke forfeiture as to assets already collected and liquidated through the receivership and the bankruptcy cases. This cleared the way for both of those civil judicial processes to complete themselves on the terms specified in the Coordination Agreement. The United States expressly

agreed not to exercise forfeiture remedies against third parties "for the return of corporate asset transfers" that had been made by the companies in bankruptcy, "including but not limited to the False Profits and other clawback or avoidance claims, including principal from purported loans or investment in" PCI and its other related entities in bankruptcy.

This, then, left the bankruptcy process to go forward on its own terms, according to its own dynamic, toward statutorily-prescribed outcomes, and in its presumptive forum. That forum is the bankruptcy court.

This simple but weighty point highlights the other consequence of the Coordination Agreement: as a measure jointly approved by two different situses of judicial power, it reflected those institutions' division of duties going forward: the district court's criminal process was not to entail forfeiture or restitution as a means of compensating victims; the district court's receivership process was to finish the liquidation of the assets of the individuals subject to it, and to distribute the proceeds as appropriate; and as to the corporate entities the major vector of recovery, liquidation, and distribution to parties holding the status of creditors or victims was to be the bankruptcy process. Within the bankruptcy endeavor, the allocation of judicial duty between the district court and the bankruptcy court was not expressly addressed. This left its structure to follow the prevailing division, summarized earlier: all cases and proceedings in the PCI grouping will remain on the docket of the undersigned, as the bankruptcy judge assigned to the original, underlying bankruptcy case, who "shall thereafter hear all matters and preside at all times in the case." Loc. R. Bankr.P. (D. Minn.) 1073–1. In the first instance, this includes "[a]ll adversary proceedings arising in or related to the case[s] . . ." *Id.*

■ As the statutory grants of jurisdiction and judicial authority and the order of reference are administered in this district, a bankruptcy judge will preside over all of the judicial work that lies within the statutory and constitutional limits of his judicial authority. Only when the nature of a particular judicial function is beyond that authority will the proceeding go to a district judge, who may exercise the full judicial power of the United States on all proceedings within the bankruptcy jurisdiction.

■ These bedrock understandings and arrangements are the fundament of the Coordination Agreement. They are no different from those applicable to any other bankruptcy case or proceeding in this district. In the case of a proceeding where a party is entitled to a jury trial and will not consent to a bankruptcy judge conducting the trial, the bankruptcy judge will retain authority over the proceeding until—at the earliest—it is established that a trial is necessary—i.e., all possibility of resolution via summary adjudication under Rule 56 or otherwise has been exhausted. *In re Mathews,* 203 B.R. at 161. *See also, e.g., In re Healthcentral.com,* 504 F.3d 775, 787 (9th Cir.2007); *In re Enron Corp.,* 295 B.R. 21, 27–28 (S.D.N.Y.2003); *In re Kirk E. Douglas, Inc.,* 170 B.R. 169, 170 (D.Colo.1994); *Stein v. Miller,* 158 B.R. 876, 879–880 (S.D.Fla.1993); *City Fire Equip. Co. Inc., v. Ansul Fire Protection Wormald U.S., Inc.,* 125 B.R. 645, 649 (N.D.Ala.1989).

In the meantime, the retention functions to make best use of the specialized expertise of the bankruptcy judiciary, in the substantive law of fraudulent and preferential transfers, the Bankruptcy Code's specific governance over its avoidance remedies, the law of unjust enrichment, and the analysis of record evidence and shifting burdens under Rule 56. *In re Healthcentral.com,* 504 F.3d at 787–788.

This will promote efficiency in dispute resolution, by making best use of accumulated judicial familiarity with historical context and structural interrelationships, by enabling quicker adjudication on issues that do not involve contests of fact, by narrowing the range of issues in litigation, and by channeling pretrial procedural disputes to a forum that is not distracted by a criminal docket with speedy-trial dictates and the heavy multi-district litigation docket that our district court has. Finally, the benefit of a uniformity of judicial approach to a docket of litigation with numerous common issues supports the retention of this and all of the other matters, as a single grouping, for the near and mid-future. *In re Enron Corp.*, 295 B.R. at 26.

For these reasons,

IT IS HEREBY ORDERED that the motion of Defendants Michael J. Hofer, et al, for a transfer of this adversary proceeding to the district court is denied.