GREENPOND SOUTH,
LLC, Appellant,

v.

GENERAL ELECTRIC CAPITAL
CORPORATION, Respondent.

No. A16–0350.

Court of Appeals of Minnesota.

Oct. 24, 2016.

Timothy D. Kelly, Dykema Gossett, PLLC, Minneapolis, MN; and K. John Shaffer (pro hac vice), Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, for appellant.

Jerome A. Miranowski, Charles F. Webber, Julie R. Landy, Faegre Baker Daniels LLP, Minneapolis, MN; and Miles N. Ruthberg (pro hac vice), Latham & Watkins LLP, New York, NY, for respondent.

Considered and decided by PETERSON, Presiding Judge; HOOTEN, Judge; and BRATVOLD, Judge.

## OPINION

HOOTEN, Judge.

Appellant challenges the dismissal of its claims against an earlier lender for damage from a Ponzi scheme,[1] claiming that the earlier lender is liable for civil conspiracy to commit fraud and aiding and abetting fraud. Appellant argues that the district court erred by concluding that it lacked authority to bring its claims and, alternatively, by dismissing its claims on the pleadings. Because appellant has failed to allege an injury separate and distinct from the injury suffered by the business entities that were utilized in the Ponzi scheme, and the fraud-related claims arising out of the Ponzi scheme were settled in bankruptcy court, we affirm.

---

1. A Ponzi scheme is a "fraudulent plan where money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns." *Cmty. First Bank v. First United Funding, LLC,* 822 N.W.2d 306, 309 n. 1 (Minn.App.2012).

## FACTS

Appellant Greenpond South, LLC, as successor in interest to Acorn Capital Group, LLC, brought claims of civil conspiracy to commit fraud and aiding and abetting fraud against respondent General Electric Capital Corporation (GECC). Greenpond argues that GECC's actions contributed to the success of a Ponzi scheme operated by Thomas Petters through a number of business entities under his control.

### Greenpond's Factual Allegations

Greenpond alleges the following facts in its amended complaint and the attached exhibits. As early as 1995 and continuing until September 2008, Petters solicited numerous lenders[2] to provide capital to his various entities, ostensibly so that the entities could purchase electronics merchandise at liquidation prices and sell it to retailers at a profit. However, neither the electronics merchandise nor the purchase orders from retailers actually existed. Instead, the entities were engaged in a Ponzi scheme whereby earlier lenders were repaid with capital provided by later lenders.

GECC was one lender that provided capital to Petters. Before doing so, GECC ran a background check on Petters and discovered that he had a criminal history that included past financial crimes. Nevertheless, GECC agreed to lend money to Petters, but GECC retained certain cash controls. In March 1998, GECC established a revolving credit facility[3] with Petters Capital, Inc., a Petters entity, to fund Petters Capital's purported purchases of electronics merchandise. In December 1999, GECC also established a revolving credit facility with RedtagBiz, Inc. (Redtag), another Petters entity, to finance accounts receivable resulting from the sale of electronics merchandise purchased over the Internet.

In January 2000, Richard Menczynski, at that time a GECC assistant vice president, provided a recommendation letter to Petters. The letter, which was written on GECC letterhead and addressed "To Whom It May Concern," described Petters Capital as "an excellent customer" and stated that the transactions under the Petters Capital credit facility had "performed well." Menczynski added that "on a personal level" he had known Petters for over two years and had "found him to be of high character and possessing strong moral values." Menczynski knew that his statements regarding Petters' character were false when he made them. No restrictions were imposed on Petters' use of the letter, and GECC understood that Petters intended to use the letter to raise capital from third-party lenders. In April 2000, Petters made a job offer to Menczynski, and Menczynski accepted the position of Redtag's vice president of finance in September 2000.

---

**2.** Parties to this litigation, as well as parties to the bankruptcy litigation of the Petters' entities, have used the term "investor" to identify a party that provided capital to Petters during the course of his Ponzi scheme. *See In re Petters Co., Inc.*, 495 B.R. 887, 892 n. 1 (Bankr.D.Minn.2013). As the bankruptcy court noted, "the term is not accurate, if one conceives of 'investment' as infusion for the receipt of equity, for the purchase of third-party securities, or even on bond financing. Tom Petters did not structure his operation around any of these vehicles." *Id.* To avoid confusion, we use the term "lender" to identify a single entity that provided capital to Petters, "loan" as an identifier for the extension of that capital, and "creditors" when referencing all of Petters' lender-victims.

**3.** The parties use the term "credit facility" in describing the lending relationship between the Petters entities and GECC. " 'Credit facilities' generally denote formal agreements to extend credit, typically by a lending institution to a business." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 409–10 (5th Cir.2009).

In October 2000, months after the recommendation letter was written, GECC discovered Petters' fraud. The chain of events that led to GECC's discovery of the fraud began in the spring of 2000, when a series of accounts receivable, allegedly generated from electronics merchandise sales to Costco, became past due. After unsuccessfully trying to enforce some of its protections under the Petters Capital credit facility, GECC contacted Costco in October 2000, seeking to authenticate certain pending Costco purchase orders, representing approximately $60 million in purported sales. Costco informed GECC that Costco had never agreed to any of the purported purchases and that there were no Costco accounts receivable. As a result, GECC learned that Petters' operation was engaged in fraud, GECC's purported collateral did not exist, and the payments it had received from the Petters entities came from a source other than merchandise sales. At this time, GECC had more than $50 million in outstanding loans to Petters Capital and Redtag. In an attempt to recoup full payment on the Petters Capital and Redtag credit facilities, GECC decided not to expose Petters' fraud.

By December 2000, the Petters Capital credit facility was satisfied in full, including "success fees," and closed. The funds used to satisfy the Petters Capital credit facility were paid not by Petters Capital, but by another Petters entity, Petters Company, Inc., using funds obtained from new lenders. GECC was told that the funds used to repay the Petters Capital credit facility were from Petters' "investors."

Petters requested that GECC lend additional funds under the Redtag credit facility, telling GECC that the additional draw was to purchase inventory from other Petters entities. Petters presented GECC with cancelled checks ostensibly showing amounts Costco paid for merchandise, but GECC discovered that these checks were fraudulent and declined to provide any additional draws to the Redtag credit facility. The Redtag credit facility was satisfied in full and closed in March 2001. GECC had no further lending relationship with Petters or any of his entities.

At the end of 2000, before the closing of the Redtag credit facility, Redtag asked GECC to document the "nature of defaults, if any" on the Redtag credit facility, in order to provide information to Redtag's auditor, Ernst & Young. GECC responded on January 30, 2001. Although GECC understood that Petters' conduct comprised multiple events of default under the Redtag credit facility, GECC indicated only that Redtag had defaulted on a net worth covenant requiring that Redtag's net worth be at least $8.1 million. Ernst & Young issued the 2001 Redtag audit opinion without knowledge of Petters' fraud. GECC knew that the Ernst & Young audit opinion would be used to induce later lenders to loan capital to the Petters entities.

The audit opinion stated that the financial statements included in the opinion "present fairly, in all material respects, the financial position of [Redtag.]" The opinion also indicated, however, that Redtag's "recurring losses and negative cash flows from operations raise substantial doubts about its ability to continue as a going concern." With regard to Redtag's relationship with GECC, the opinion stated that in January 2001 Redtag's borrowing capacity was reduced from $55 million to $600,000 and that Redtag "was in violation of certain covenants of the revolving credit facility [as of] December 31, 2000."

After GECC was paid in full, Petters invited Acorn to enter into a lending relationship with Redtag. On April 24, 2001, Marlon Quan, on behalf of Acorn, met with

Petters, Redtag's CEO and majority and controlling shareholder, and Menczynski, now Redtag's CFO. At this meeting, Petters and Menczynski provided Quan with Menczynski's January 2000 recommendation letter and Ernst & Young's January 2001 audit opinion. Petters and Menczynski represented to Quan that GECC had enjoyed a successful lending relationship with Petters Capital and Redtag and that the reason why GECC was no longer lending to the Petters entities was because GECC would not expand the size of its credit facilities.

Acorn agreed to loan money to Redtag, and beginning in 2002, with a number of other Petters entities. Acorn specifically relied on the January 2000 recommendation letter, the January 2001 audit opinion, and the April 2001 meeting in making each of its decisions to lend money to the Petters entities. Petters' Ponzi scheme was uncovered in September 2008, and Acorn lost approximately $141 million.

**The Petters Bankruptcy**

In addition to the allegations set forth in Greenpond's complaint, the record also contains the following facts regarding the Petters bankruptcy, *In re Petters Co.*, No. 08–45257 (Bankr.D.Minn.).[4] The Petters business entities entered into receivership. The receiver filed bankruptcy proceedings on behalf of the Petters entities and was appointed the Chapter 11 trustee of the bankruptcy actions.

Asset Based Resource Group, LLC (ABRG), Acorn's successor servicer, filed claims seeking recovery of the losses sustained by Acorn in the Petters bankruptcy actions. In October 2010, the Petters bankruptcy trustee filed a clawback action against GECC, alleging numerous counts of fraudulent transfer.[5] The trustee sought to recover and preserve the property of the estate by recovering the value of the transfers made to GECC "for the benefit of defrauded individuals and organizations that are creditors of [the Petters entities]." The trustee alleged that GECC was liable for actual fraud because GECC knew of Petters' fraud, failed to disclose the fraud in order to receive payment on its loans, and knew that it was repaid from other Petters entities and lenders.

---

4. In its order granting GECC's motion to dismiss, the district court took judicial notice of adjudicated findings and orders from the Petters bankruptcy action. We note that a number of opinions have already been issued in the Petters bankruptcy action and that the bankruptcy proceedings, which commenced in 2008, are ongoing.

5. In a clawback action, "a trustee or receiver puts all parties that transacted with the purveyor of a failed Ponzi scheme onto a parity in the matter of restitution" by "invoking remedies of avoidance (under theories of fraudulent transfer, unjust enrichment, and the like) against those lenders and investors who got repaid in whole or in part before the collapse." *In re Petters Co.*, 440 B.R. 805, 806 (Bankr.D.Minn.2010).

Generally, a "preferential transfer in favor of one bona fide creditor over another" is permissible, provided that transfer "is not fraudulent." *Finn v. All. Bank*, 860 N.W.2d 638, 653 (Minn.2015). However, "a Ponzi scheme is a rolling fraud, involving a linear sequence of victims." *In re Petters Co.*, 550 B.R. 457, 476 (Bankr.D.Minn.2016). First, "a lender or investor is gulled into advancing money by a fraud in the inducement," and then "a second lender or investor (or more than one such if the perpetrator's needs require) is gulled in a similar fashion[ ] into infusing on the pretense of an investment in a different transaction. Its later-made cash infusion is diverted to the satisfaction of earlier lenders' claims." *Id.* at 476–77.

Thus, because "[f]raud imbues the creation of a transferee's original right to payment from the perpetrator[,] and a separate, later fraud enables the payment made in facial satisfaction of that earlier-created right," these transfers made in satisfaction of earlier debts are subject to "the fraud exclusion to the permissible-preference construct" and are ripe for clawback. *Id.* at 478.

With respect to the claims brought in the trustee's complaint against GECC, the bankruptcy court approved a settlement by the parties in an order filed June 25, 2012. The bankruptcy court found that the trustee was authorized to enter into the settlement agreement and that approval of the trustee's entry into the settlement agreement was in the best interests of the Petters entities, their creditors, and their estates. As part of the settlement, GECC agreed to pay $19 million. In return, the trustee released GECC from any and all claims that the trustee may have had against GECC up through the effective date of the settlement agreement. ABRG, acting on behalf of Acorn, did not object to the trustee's settlement with GECC.

## Procedural History of This Action

In April 2014, Greenpond, as successor in interest to Acorn, served on GECC and filed in state district court a complaint alleging claims of civil conspiracy to commit fraud and aiding and abetting fraud. GECC filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Minn. R. Civ. P. 12.02(e). Greenpond subsequently sought to amend its complaint. A hearing was held in August 2015 to determine the effect of the amendment on GECC's motion to dismiss, and, following the hearing, the parties agreed that they would make supplemental submissions based on the amended complaint and would forego an additional hearing. After receipt of supplemental submissions, the district court granted GECC's motion to dismiss Greenpond's amended complaint, concluding that Greenpond lacked "standing" to bring claims based on GECC's failure to disclose Petters' fraud and, alternatively, that Greenpond failed to sufficiently state claims for either civil conspiracy or aiding and abetting fraud. This appeal followed.

## ISSUES

Did the district court err in determining that Greenpond lacked authority to bring claims based on GECC's failure to disclose Petters' fraud?

## ANALYSIS

In reviewing a district court's ruling on a motion to dismiss under Minn. R. Civ. P. 12.02(e), we review the legal sufficiency of the claim de novo. *Bahr v. Capella Univ.*, 788 N.W.2d 76, 80 (Minn. 2010). In conducting our review, we accept all of the facts alleged in the complaint as true and "construe all reasonable inferences in favor of the nonmoving party." *Id.* (quotation omitted). We will not uphold a district court's dismissal under rule 12.02(e) "if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded." *N. States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963).

Greenpond argues that the district court erred in concluding that it did not have "standing" to pursue its claims against GECC. In granting GECC's motion to dismiss, the district court reasoned that Greenpond's claims belonged to the bankruptcy trustee because they were derivative, and not direct, claims. We review a district court's decision regarding whether a claim is direct or derivative de novo. *Blohm v. Kelly*, 765 N.W.2d 147, 153 (Minn.App.2009).

Before beginning our analysis, we note that most of the cases addressing the issue of whether a claim belongs to a bankruptcy trustee or a creditor have used the term "standing" rather than "authority." *See, e.g., Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). The Seventh Circuit has stated, however, that

the determination of whether a claim belongs to a bankruptcy trustee or a creditor is not a question of standing, but rather is a "question on the merits" because it asks whether Congress gave the trustee the authority to pursue the claim. *Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900 (7th Cir.2010). We find this reasoning to be persuasive and use the term "authority." Moreover, although the parties, and the district court, used the term "standing" rather than "authority," the differing terminology makes no substantive difference in our analysis.

 The bankruptcy trustee has the sole right to bring claims belonging to the estate, including claims on behalf of creditors. *See* 11 U.S.C. § 544 (2012); *Leffler v. Leffler*, 602 N.W.2d 420, 422–23 (Minn. App.1999). The federal bankruptcy code defines "property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (2012). The property of the estate "includes any causes of action that have accrued to the debtor." *Leffler*, 602 N.W.2d at 422. "The purpose and duty of the [bankruptcy] trustee is to gather the estate's assets for pro rata distribution to the estate's creditors." *In re Teknek, LLC*, 563 F.3d 639, 645 (7th Cir.2009). "The trustee's single effort eliminates the many wasteful and competitive suits of individual creditors" and "'protect[s] the creditors from one another.'" *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1342–43 (7th Cir.1987) (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210, 65 S.Ct. 594, 597, 89 L.Ed. 890 (1945)). Because the trustee has the "duty to marshal the debtor's property for the benefit of the estate," the trustee also has the right to sue parties for recovery of property and "then distribute[ ] the amounts collected on a *pro rata* basis to all creditors in

accord with the bankruptcy provisions and theme of equality of distribution." *Id.* at 1343 (quotation omitted).

 State law determines the "nature and extent" of the Petters bankruptcy estate's interest in the claims brought by Greenpond; in other words, state law controls whether Greenpond's claims are direct or derivative. *See In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir.1985); *see also In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir.2007) ("Whether a particular cause of action arising under state law belonged to the debtor in bankruptcy or to someone else is determined by state law."). If Greenpond's claims are derivative, they belong exclusively to the bankruptcy estate. *See Nat'l City Bank v. Coopers & Lybrand*, 409 N.W.2d 862, 869–70 (Minn.App.1987) (concluding that, because claim was derivative, claim belonged to bankruptcy estate and could be brought only by the trustee), *review denied* (Minn. Oct. 21, 1987); *see also* 11 U.S.C. § 541(a)(1). When a claim can be brought by the bankruptcy estate, "the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).

 Within the context of shareholder litigation, Minnesota courts, in determining whether a shareholder's claim is direct or derivative, have focused the inquiry to "whether the complained-of injury was an injury to the shareholder directly, or to the corporation." *Wessin v. Archives Corp.*, 592 N.W.2d 460, 464 (Minn.1999). "Where the injury is to the corporation, and only indirectly harms the shareholder, the claim must be pursued as a derivative claim." *Id.* The Minnesota Supreme Court has applied the concept of distinguishing between direct and derivative claims outside of traditional shareholder litigation to

claims of fraud brought by a debtholder arising out of a relationship with a bank that was placed in receivership. *See Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 617 (Minn.1995) (noting, in its determination that debtholder's fraud claims were direct, rather than derivative of bank's claims, that "Minnesota has long adhered to the general principle that an individual shareholder may not assert a cause of action that belongs to the corporation"). In *Northwest Racquet*, the supreme court suggested that one method for distinguishing between direct and derivative claims "is to consider whether the injury to the individual plaintiff is separate and distinct from the injury to other persons in a similar situation as the plaintiff." *Id.* at 617. In determining whether a claim is direct or derivative, we look to the injury itself, rather than the legal theory in which it is couched. *Wessin*, 592 N.W.2d at 464.

■ Greenpond claims that Acorn would not have loaned money to the Petters entities but for GECC's failure to disclose Petters' fraud. However, the injury Acorn suffered is not separate and distinct from injuries suffered by other lenders. The claims that Greenpond makes here have already been pursued unsuccessfully by a number of other Petters lenders. These lenders also attempted to pursue claims of aiding and abetting fraud and conspiracy to commit fraud against GECC, arguing that they suffered harm as a result of GECC's failure to disclose Petters' fraud. *See Gecker v. Gen. Elec. Capital Corp.*, No. 14 C 8447, 2015 WL 5086398 (N.D.Ill. July 27, 2015); *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F.Supp.3d 321 (S.D.N.Y.2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016). As explained by the federal bankruptcy court, the complaints of the creditors in this case alleged "a massive multi-year Ponzi scheme that involved many dozens of lender-investors and tens of thousands of transfers on transactions documented and treated as loans." *In re Petters Co.*, 499 B.R. 342, 351 (Bankr.D.Minn. 2013). "Such an operation would be absolutely dependent on the pervasive exploitation of fraudulent misrepresentation and false pretense, *as to all parties* with which [the Petters entities] transacted." *Id.* (emphasis in original).

None of the facts alleged by Greenpond distinguish the injury it suffered from the injury suffered by other lenders. We note that Acorn's relationship with Petters began approximately a month after GECC's relationship with Petters ended, while the lenders in the other cases that have been brought against GECC began to loan money to Petters more than five years after GECC's relationship with Petters ended. *See Gecker*, 2015 WL 5086398, at *3 (involving claims brought against GECC by entity that began lending to Petters entity in July 2007); *Ritchie*, 121 F.Supp.3d at 329 (involving claims brought against GECC by entity that began lending to Petters entities in February 2008). But, the length of time that elapsed between GECC's actions regarding the recommendation letter and the 2001 audit opinion relates to the reasonableness of the lender's reliance on GECC's actions, which is unrelated to our analysis of whether the claims Greenpond attempts to bring are direct or derivative. The closer temporal proximity in this case between GECC's actions and the commencement of the lender's relationship with Petters does not change the fact that the injury Acorn suffered—the loss of funds it loaned to the Petters entities because of the Ponzi scheme—is not distinct from the injury suffered by other lenders.

Greenpond contends that the Minnesota Supreme Court's decision in *Northwest*

*Racquet* is controlling because the facts of that case are analogous to the facts presented here. In *Northwest Racquet,* an auditor issued an opinion regarding the financial status of Midwest Federal Savings & Loan Association. 535 N.W.2d at 614. Plaintiff Northwest Racquet claimed that the auditor, in cooperation with Midwest, misrepresented Midwest's financial status and that the audit opinion was provided to Northwest Racquet by Midwest in order to induce it to purchase a $15 million debenture from Midwest. *Id.* at 614–616. After Midwest collapsed and a receiver was appointed, Northwest Racquet sued the auditor for fraud. *Id.* at 613, 616–17. The supreme court, in determining that Northwest Racquet had authority to pursue its claim, concluded that its claims were direct, not derivative. *Id.* at 619. The supreme court reasoned that Northwest Racquet alleged specific misrepresentations in the audit opinion that affected it directly in its decision to purchase Midwest's debt and that "it is this claim of direct fraud and the resulting injury that is separate and distinct from any fraud claim belonging to Midwest and from any injury to the debenture holders generally." *Id.*

This case is factually distinguishable from *Northwest Racquet.* In *Northwest Racquet,* there was no bankruptcy or bankruptcy trustee and there were no allegations that the loss sustained by Northwest Racquet was the result of a Ponzi scheme affecting numerous other entities. Rather, *Northwest Racquet* involved a direct claim of fraud by Northwest Racquet against an auditor for allegedly working with Midwest to misrepresent Midwest's financial position and that, as a result of its reliance upon the statements, Northwest Racquet sustained an injury separate and distinct from Midwest and the bank's other debenture holders. *Id.* And in this case, unlike in *Northwest Racquet,* the fraud claim can be and has been brought by another entity, the Petters bankruptcy trustee. Therefore, we conclude that Greenpond alleges only derivative claims in its amended complaint that necessarily belong to the bankruptcy estate, not Greenpond.

Furthermore, it is irrelevant that Greenpond's claims against GECC are for conspiracy to commit fraud and aiding and abetting fraud while the trustee's action against GECC primarily involved federal and state statutory claims of actual and constructive fraudulent transfer. Under any of these legal theories, the harm sustained by the Petters entities as a result of fraudulent withdrawals from their accounts of other lenders' funds was its insolvency and inability to repay its creditors. *See In re Bernard L. Madoff Inv. Sec. LLC,* 740 F.3d 81, 92 (2d Cir.2014). And, under the *Wessin* test, which distinguishes direct from derivative claims by determining whether the injury harmed the stakeholder directly or the corporation, the injury here was suffered by the Petters entities as a direct result of Thomas Petters' actions, and only indirectly harmed Acorn and the other creditors of the Petters entities. Acorn's injury, loss of money loaned to the Petters entities, is inseparable from and based upon an injury suffered by the Petters entities, namely the fraudulent transfer to GECC of funds belonging to other defrauded Petters creditors. Claims resulting from this harm belong to the bankruptcy estate, and the trustee has sued GECC and settled and released these claims on behalf of the creditors.

Our decision that Greenpond's claims are derivative does not mean that a lender or investor that has knowledge of and is involved in an intentionally fraudulent transfer has the same defenses against clawback actions as less culpable lenders

or investors in a Ponzi scheme. Certain protections are available under both federal and state law to lenders or investors who are able to prove that they acted in good faith. *See* 11 U.S.C. § 548(c) (2012); Minn.Stat. § 513.48(a) (Supp.2015) (providing defense to fraudulent transfer action to extent transferee takes for value and in good faith). A lender or investor "does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995). In his complaint against GECC, the trustee raised the issue of GECC's knowledge of the fraud, arguing many of the same facts that Greenpond raises in the present case. Presumably, both GECC and the trustee weighed the probability of GECC successfully asserting a defense of good faith in negotiating and agreeing to the terms of the settlement in bankruptcy court on behalf of the Petters creditors.

Based on the arguments made by the parties, we conclude that Greenpond's claims that Acorn suffered an injury because of GECC's misrepresentations are derivative claims that belonged to, and were acted upon by, the Petters bankruptcy estate and trustee. Because we conclude that the district court did not err in determining that Greenpond lacked authority to bring its claims against GECC, we will not address Greenpond's alternative argument that the district court erred in dismissing its claims on the pleadings.

## DECISION

Because Greenpond failed to allege an injury separate and distinct from an injury suffered by the business entities that were utilized in a Ponzi scheme, we conclude that Greenpond lacks the authority to assert claims against GECC for either civil conspiracy or aiding and abetting fraud.

**Affirmed.**

