**IN RE: PALM BEACH FINANCE PARTNERS, L.P., Palm Beach Finance II, L.P., Debtor(s).**

**Barry Mukamal, Plaintiff,**

v.

**General Electric Capital Corporation, Defendant.**

**CASE NO.: 09–36379–BKC–PGH, CASE NO.: 09–36396–BKC–PGH (jointly administered)**
**ADV. NO.: 12–1979–BKC–PGH–A**

United States Bankruptcy Court,
S.D. Florida,
**West Palm Beach Division.**

Signed June 15, 2017

---

Michael S. Budwick, Esq., Meland Russin & Budwick, PA, Miami, FL, Solomon B. Genet, Zachary N. James, David S. Mandel, Esq., Miami, FL, for Plaintiff.

Sean M. Berkowitz, David S. Foster, Chicago, IL, Patricia A. Redmond, Miami, FL, for Defendant.

## ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

Paul G. Hyman, Jr., Judge, United States Bankruptcy Court

**THIS MATTER** came before the Court upon the *Motion for Summary Judgment* ("GECC's Motion for Summary Judgment") (ECF No. 510) filed by Defendant General Electric Capital Corporation ("GECC") and the *Motion for Partial Summary Judgment* (the "Plaintiff's Motion for Summary Judgment") (ECF No. 509) filed by Plaintiff Barry Mukamal (the "Plaintiff") in his capacity as Liquidating Trustee for the Palm Beach Finance Liquidating Trust and the Palm Beach Finance II Liquidating Trust (together known as the "Palm Beach Liquidating Trusts"). Having considered the extensive briefing[1]

---

1. In addition to their respective Motions for Summary Judgment, the parties submitted a *Joint Statement of Undisputed Facts* (ECF No. 537), a *Joint Statement of Disputed Facts* (ECF No. 538), and a *Joint Notice of Filing of Exhibits in Support of Joint Statement of Undisputed Facts* (ECF No. 540) (which contained 88 exhibits consisting of over 2500 pages); GECC submitted a *Notice of Supplemental Authority* (ECF No. 518), a *Response to the Plaintiff's Motion for Summary Judgment* (ECF No. 551), a *Statement of Disputed Facts in Opposition to Plaintiff's Motion for Summary Judgment* (ECF No. 553), a *Reply in*

submitted by both GECC and the Plaintiff and for the reasons discussed below, the Court denies both Motions for Summary Judgment.

## UNDISPUTED FACTS AND PROCEDURAL BACKGROUND

The following relevant [2] facts are undisputed by virtue of the parties' *Joint Statement of Undisputed Facts* (the "Joint Statement") (ECF No. 537).

### I. The Petters Ponzi Scheme

From 1995 through September 2008, Thomas J. Petters ("Petters") perpetrated a Ponzi scheme or schemes [3] (the "Petters Ponzi Scheme") through Petters Company, Inc. ("PCI"), a special purpose entity wholly owned and controlled by Petters, along with several other special purpose entities (the "Petters SPEs"). Joint Statement, ¶¶ 116, 126–27. PCI created the Petters SPEs over the years to facilitate the hedge funds' lending, and through which funds would provide their financing. The Petters SPEs consisted of: PC Funding, LLC, Thousand Lakes LLC, SPF Funding LLC, PL Ltd. Inc., Edge One LLC, MGC Finance Inc., PAC Funding LLC and Petters Capital, Inc. ("Petters Capital"). All of the Petters SPEs were owned by PCI except for Petters Capital,[4] which Petters owned directly. The Petters SPEs were managed in conjunction with PCI. *Id.* at ¶¶ 140, 148.

Deanna Coleman ("Coleman"), who began working for Petters in 1993, was a central participant who worked closely with Petters in perpetrating the Petters Ponzi Scheme. *Id.* at ¶¶ 117, 123. Coleman and Bob White ("White") were the primary forgers of the forged documents created in order to perpetrate the Petters Ponzi Scheme. *Id.* at ¶ 123. Coleman generally acted at Petters' direction in connection with her activities at PCI. *Id.* at ¶ 128.

The Petters Ponzi Scheme included defrauding lenders by misrepresenting that PCI and the Petters SPEs were engaged in real transactions, selling real inventory to real customers, providing real collateral to lenders, and paying lenders from the proceeds of real transactions rather than from money sourced from other defrauded lenders. *Id.* at ¶ 133. According to Coleman, "By 1995 investors who were putting their money in PCI were basically all investing in fake deals at that point." *Id.* at ¶ 124. Indeed, soon after being incorporated in 1994, PCI began to borrow money from lenders by misrepresenting the legiti-

---

Support of GECC's Motion for Summary Judgment (ECF No. 572), a *Notice of Filing Additional Exhibits* (ECF No. 573), and a *Notice of Filing Supplemental Appendix* (ECF No. 574); and the Plaintiff filed a *Response to GECC's Motion for Summary Judgment* (ECF No. 550), a *Reply in Support of the Plaintiff's Motion for Summary Judgment* (ECF No. 571), and a *Notice of Filing of Additional Exhibits* (ECF No. 552).

2. The Joint Statement contains 46 pages of undisputed facts. Many of these facts, however, are irrelevant to the issues raised in the Motions for Summary Judgment. Accordingly, the Court only recites those facts which are relevant to the issues now before the Court.

3. In their Joint Statement, the parties note that:

Neither of the parties, by using the defined term "Petters Ponzi [Scheme]," waives its right to dispute the nature and extent of this scheme or schemes. The Trustee asserts that there was a single continuous fraudulent scheme. GECC asserts that the Petters Ponzi was not a unitary scheme, but changed over time and involved different types of fraud, different methods of executing fraud, different time periods, different entities, and different investors

Joint Statement at 17, n. 7.

4. Petters Capital SPE changed its name to Palm Beach Finance Holdings, Inc. on February 7, 2005. Joint Statement, ¶ 147.

macy of fake transactions. *Id.* at ¶¶ 125, 130. In or around 1998 or 1999, White began making fake documents for PCI at the direction of Petters and Coleman to provide to PCI's lenders. The fake documents included fake retailer purchase orders, fake bank statements, fake tax returns, fake bills of lading, and fake checks. White also created fake purchase orders to misrepresent that PCI sold merchandise to big-box retailers such as Costco and Sam's Club, while Coleman created fake purchase orders to misrepresent that PCI purchased merchandise from suppliers. Petters and Coleman provided the fake documents to PCI lenders in order to deceive them. In fact, there was generally no merchandise that was resold to the retailers, and substantially all of PCI's business and transactions were fake. *Id.* at ¶¶ 131, 142–43.

Petters generally portrayed PCI to lenders as a "diverter" of goods that bought consumer electronic goods from wholesale suppliers and resold those goods to large "big-box" retailers. At times these big-box retailers included Costco, Sam's Club, BJ's Wholesale Club, Rex and Boscov's. *Id.* at ¶ 139. In or around 2002, Petters approached Larry Reynolds ("Reynolds") and Michael Catain ("Catain") to have businesses pose as PCI wholesale suppliers. Catain utilized a company called Enchanted Family Buying Company ("Enchanted"). Reynolds utilized a company called Nationwide International Resources ("Nationwide"). PCI provided lenders with forged purchase orders that purported to show PCI buying goods from Enchanted or Nationwide, and others purporting to show a vendor, typically a big-box retailer, purchasing the merchandise from PCI. In those instances, the lender would wire funds directly to the purported wholesale supplier. The inventory seller would then wire nearly all the funds to a bank account number XXXXXXX (the "PCI Account") that PCI maintained at Marshall & Ilsley Bank, usually on the same day, while retaining a portion for itself. Meanwhile, PCI represented to its lenders that it received payments into the PCI Account directly from its purported big-box retailer customers. *Id.* at ¶ 149 & n. 9. PCI of course rarely received payments from big-box retailers because PCI rarely entered into real diverting transactions. *Id.* at ¶ 181.

PCI used the funds raised from deceived lenders—and often routed through fake wholesale suppliers to the PCI Account— to repay other lenders or, in some instances, to repay the lender that provided the funds in the first instance, to pay salaries and bonuses and other overhead costs, to fund the business operations of other Petters entities, to fund other business transactions, such as the acquisitions of Polaroid, Sun Country Airlines, and Fingerhut, and for Petters' personal use. *Id.* at ¶¶ 149, 181.

## II. GECC's investment relationship with Petters

In March 1998, GECC established a $50 million revolving credit line (the "GECC– Petters Capital Line") with Petters Capital. In December 1999, GECC established a separate revolving credit facility (the "Redtag Line") with redtagoutlet.com, Inc. ("Redtag"), a company for which Petters was the CEO and one of the shareholders. Joint Statement, ¶¶ 1, 2. Draws on the Petters Capital Line were to be used in connection with the purchase and resale of merchandise and not for general operations or working capital. Petters told GECC that all deals were "pre-sold," meaning that when Petters Capital purchased inventory, it had already secured a purchaser for those same goods. Petters Capital used the vast majority of the money advanced by GECC to engage in fraud-

ulent transactions. According to Coleman, all the transactions GECC funded were either fake or mostly fake. *Id.* at ¶¶ 190–92.

Richard Menczynski, an employee of GECC at all relevant times, helped underwrite the GECC–Petters Capital Line and was the primary account manager for the GECC–Petters Capital Line from 1999 to August 2000. *Id.* at ¶¶ 8, 193. Sometime before October 1999, Menczynski informed Petters that he was having personal financial difficulties. By October 1999, Petters loaned at least $37,000.00 to Menczynski. Menczynski's first installment payment on his loan was due on January 1, 2000. Menczynski did not make any repayments on the loan. *Id.* at ¶ 195. On January 4, 2000, upon a request from Petters, Menczynski signed and transmitted a reference letter (the "January 4, 2000, Letter") to Petters. *Id.* at ¶¶ 10, 196; *Joint Notice of Filing of Exhibits* ("Joint Exhibits") (ECF No. 540), Ex. 5. The January 4, 2000, Letter, written on General Electric ("GE") letterhead and signed by Menczynski as Assistant Vice President, stated:

> To Whom It May Concern:
>
> I am writing this letter for the purpose of a personal and business reference on Mr. Thomas J. Petters. Petters Capital, Inc. ("Petters") and General Electric Capital Corporation ("GE Capital") closed a $50.0MM Senior Secured Revolving Credit Facility on March 26, 1998. During this time, the transactions under the Credit Facility have performed well and Petters continues as an excellent customer.
>
> On a personal level, I have known Mr. Petters for a little over two years and have found him to be of high character and possessing strong moral values.

Joint Exhibits, Ex. 5. Menczynski's final day of employment at GECC was September 15, 2000. Menczynski began working at Redtag in September 2000. Joint Statement, ¶¶ 204, 205.

On October 9, 2000, Petters Capital and GECC entered into a letter agreement related to the termination of the GECC–Petters Capital Line. Petters repaid the GECC–Petters Capital Line by December 8, 2000. On December 14, 2000, GECC sent Petters a letter attaching executed UCC termination statements for Petters Capital. Petters did not file the terminations. On March 12, 2001, GECC provided a letter to Redtag confirming termination of the Redtag Line and enclosing UCC termination statements. There were no further loans made by GECC to Petters or his companies after the Redtag credit facility was closed in March 2001. *Id.* at ¶¶ 3–7.

## III. The Palm Beach Funds' investment relationship with Petters

In 2002, David Harrold ("Harrold") and Bruce Prevost ("Prevost") were recruited by Petters' associate Frank Vennes ("Vennes") to provide an additional source of financing for what Petters contended to be an inventory financing business. Ultimately, Harrold and Prevost decided to go forward with providing financing to Petters in what they testified they understood to be a legitimate business. *Id.* at ¶¶ 27, 31. In November 2002, Prevost and Harrold created Palm Beach Finance Partners, L.P., the first Palm Beach hedge fund ("PBFP"). In mid–2004, Prevost and Harrold created a second hedge fund, Palm Beach Finance II, L.P. ("PBF II", and together with PBFP, the "Palm Beach Funds"). *Id.* at ¶¶ 51, 53. From November 2002 until October 2008, Prevost and Harrold controlled and managed the Palm Beach Funds through the Funds' general partner, Palm Beach Capital Management, L.P., and an investment management enti-

ty, Palm Beach Capital Management, L.L.C. *Id.* at ¶ 55.

PBFP and PBF II were each established to fund promissory notes issued by Petters Capital to PBFP and PBF II (the "Promissory Notes"). The proceeds received by Petters Capital from each respective Promissory Note transaction were to be used to finance PCI's purported purchase and sale of a particular lot of consumer electronics (the "Promissory Note Transactions"). The Palm Beach Funds had sole and exclusive discretion to approve or reject each specific Promissory Note financing request, and each Promissory Note was specifically approved by either Prevost or Harrold. *Id.* at ¶¶ 58–62. The Palm Beach Funds did not provide financing to Redtag. From 2002 through September 2008, the Palm Beach Funds did not have any direct communications, contact, or conversations with GECC or any of its then-employees. *Id.* at ¶ 56.

PBFP funded its first four Promissory Notes from November 27 through December 12, 2002, totaling $10 million in principal—the entire amount of PBFP's capital. In connection with the first three Promissory Notes funded by PBFP in 2002, PBFP received payments in February 2003 from Petters equal to the principal and interest reflected on the face of those three Promissory Notes. In connection with the fourth Promissory Note, PBFP received payment from Petters in March 2003 equal to the principal and interest reflected on the face of that Promissory Note. *Id.* at ¶¶ 68, 69.

Each Promissory Note was purportedly collateralized by a separate lot of consumer electronics merchandise, had an individual due date, and was funded with specifically designated funds, even when multiple Promissory Notes were funded on the same day. When Petters sent payments to the Palm Beach Funds in connection with

the Promissory Notes, those payments were designated to correspond with specific Promissory Notes, even on days in which Petters sent multiple payments to the Palm Beach Funds in connection with various Promissory Notes. The Promissory Note Transactions were memorialized by separate Promissory Notes and other documentation—which was sometimes missing in part or late—including, but not limited to, a cover letter from PCI, purported purchase orders from PCI and a big-box retailer, and a UCC financing statement. *Id.* at ¶¶ 64–66.

From November 27, 2002 until the Petters Ponzi Scheme collapsed on September 24, 2008, the Palm Beach Funds entered into 2,449 individual PCI Promissory Note Transactions, totaling approximately $8.7 billion in principal. *Id.* at ¶ 85. For each of the first 1,854 Promissory Notes, which comprise all of the Notes funded through August 30, 2007, the Palm Beach Funds received cash payments from Petters equal to the principal and interest reflected on the face of each such Promissory Note. The aggregate principal amount reflected on the face of these 1,854 Promissory Notes was approximately $7.5 billion, and the Palm Beach Funds also received cash payments totaling approximately $297.3 million, which was the aggregate amount of the interest reflected on the face of the 1,854 Promissory Notes. *Id.* at ¶¶ 89, 90.

The first Promissory Note for which the Palm Beach Funds did not receive cash payment equal to the total principal and interest reflected on the face of the Promissory Note was issued on August 31, 2007. *Id.* at ¶ 91. In the fall of 2007, the Promissory Notes started to extend beyond 90 days without repayment, and by February 2008, hundreds of millions of dollars of Promissory Notes were approaching their 182–day due date. Beginning on February 20, 2008, the Palm Beach Funds engaged

in a series of transactions (the "Note Exchanges") in which Promissory Notes that were approaching maturity (the "Old Notes") were exchanged for new Promissory Notes, purportedly collateralized by separate lots of newer merchandise, that were not due to be paid for another 182 days (the "New Notes"). The Palm Beach Funds exchanged more than $1 billion in Old Notes for New Notes over the seven-month period from February to September 2008. By August 2008, some of the New Notes that the Palm Beach Funds had received in Note Exchanges in February and March 2008 were approaching their maturity dates, and the Palm Beach Funds entered into a new series of Note Exchanges as to some of those New Notes. *Id.* at ¶¶ 95–98.

On September 24, 2008, federal law enforcement raided Petters' Minnesota headquarters, marking the end of the Petters Ponzi Scheme. Petters Capital had issued the Palm Beach Funds 270 Promissory Notes that were "outstanding"[5] as of September 24, 2008, with an aggregate face principal amount of more than $1 billion. All of these Promissory Notes were funded on or after August 31, 2007. *Id.* at ¶¶ 99–100, 103.

## IV. The collapse and aftermath of the Petters Ponzi Scheme

### A. Criminal charges

As noted above, federal law enforcement raided Petters' Minnesota headquarters on September 24, 2008, after Coleman informed the United States Attorney's Office of the Petters Ponzi Scheme. *Id.* at ¶¶ 99, 207. On December 1, 2008, Petters was charged by indictment with various criminal offenses in connection with the Petters Ponzi Scheme. *Id.* at ¶ 210. On December 2, 2009, a federal jury found Petters guilty of all 20 counts charged in the indictment. *Id.* at ¶ 219; Joint Exhibits, Ex. 61. On April 9, 2010, District Judge Richard H. Kyle sentenced Petters to 50 years in prison, and he is incarcerated at Leavenworth Penitentiary. The United States Court of Appeals for the Eighth Circuit affirmed Petters' conviction and sentence. Joint Statement, ¶ 220; *see also U.S. v. Petters,* 663 F.3d 375 (8th Cir. 2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 2417, 182 L.Ed.2d 1024 (2012). On May 10, 2013, Petters filed a motion to vacate or set aside his sentence. On December 5, 2013, Judge Kyle denied Petters' motion to vacate his sentence. Joint Statement, ¶ 221; *see also U.S. v. Petters,* 986 F.Supp.2d 1077, 1086 (D. Minn. 2013). Coleman, White, Catain, Reynolds, PCI, and PGW were also criminally prosecuted for various crimes in connection with the Petters Ponzi Scheme. Joint Statement, ¶ 209. Coleman, White, Catain, and Reynolds all allocuted to their crimes and entered into plea agreements. Joint Statement, ¶¶ 212–215; Joint Exhibits, Exs. 49–56. On September 29, 2010, PCI and PGW, through their appointed bankruptcy trustee, pled guilty to charges of wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering. Joint Statement, ¶ 223, Joint Exhibits, Exs. 65, 66.

### B. The Petters Bankruptcy Cases

In early October 2008, certain Petters-affiliated entities (the "Petters Entities"),[6]

---

5. In their Joint Statement, the parties note that "[n]either party by use of the word 'outstanding' limits or waives its right to dispute the validity of any of the Petters Promissory Notes or assert that they are void as instru-

ments of fraud or otherwise." Joint Statement at 15, n. 6.

6. Petters himself never filed for bankruptcy. Joint Statement, ¶ 273.

including PCI, Petters Capital (n/k/a Palm Beach Finance Holdings, Inc.) and Petters Group Worldwide, LLC ("PGW"), filed bankruptcy petitions in the United States Bankruptcy Court for the District of Minnesota, commencing the "Petters Bankruptcy Cases."[7] Joint Statement, ¶ 224. In February 2009, the bankruptcy court approved the appointment of Douglas Kelley ("Trustee Kelley") as the Chapter 11 Trustee in the Petters Bankruptcy Cases. *Id.* at ¶ 104. On October 22, 2008, the Petters Bankruptcy Cases were jointly-administered under lead case *In re Petters Company, Inc.*, Case No. 08–45257. *Id.* at ¶ 225. On November 21, 2008, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "PCI Committee") in the Petters Bankruptcy Cases, and the Plaintiff was appointed as a member of the PCI Committee. *Id.* at ¶ 226–27. On November 22, 2013, the Petters Bankruptcy Cases (including Petters Capital n/k/a Palm Beach Finance Holdings, Inc.) other than PGW[8] were substantively consolidated under lead debtor-case PCI (the "Petters Sub–Con Order"). *Id.* at ¶ 228.

On April 22, 2009, the Palm Beach Funds filed proofs of claim in each of the Petters Bankruptcy Cases, including claim numbers 35 and 36 in the PCI bankruptcy case and claim numbers 35 and 36 in the PGW bankruptcy case. Promptly following his appointment as the Palm Beach Funds' trustee, the Plaintiff amended these proofs of claim to reflect that he is the holder of these claims (the "PBF POCs"). *Id.* at ¶ 229; Joint Exhibits, Ex. 67. In October 2010, Trustee Kelley filed both an objection to the PBF POCs and an adversary proceeding against GECC.

On April 15, 2016, Judge Kishel of the United States Bankruptcy Court for the District of Minnesota issued an order confirming a chapter 11 plan (the "Petters Confirmation Order") in the Petters Bankruptcy Cases. *Id.* at ¶ 264–65. The Petters Confirmation Order resulted in the formation of the PCI Liquidating Trust Committee, of which the Plaintiff is a member. *Id.* at ¶ 266. On July 7, 2016, the Palm Beach Liquidating Trusts received interim distributions in the amount of $2,998,877.95 and $19,906,999.11. *Id.* at ¶ 268.

C. The Palm Beach Funds' bankruptcy filing

On November 30, 2009, Kenneth A. Welt as Chief Restructuring Officer filed petitions for chapter 11 bankruptcy on behalf of PBFP and PBF II, respectively. *Id.* at ¶ 232; *see also* Case Nos. 09–36379–BKC–PGH and 09–36396–BKC–PGH. These bankruptcy cases were consolidated for joint administration under the lead case, 09–36379–BKC–PGH (the "PBF Main Case"), and on January 29, 2010, the Plaintiff was appointed as the chapter 11 trustee. Joint Statement, ¶ 232. In October 2010, the Plaintiff obtained confirmation a joint chapter 11 plan of liquidation,[9]

---

**7.** The "Petters Bankruptcy Cases" shall mean the following bankruptcy cases pending before the United States Bankruptcy Court for the District of Minnesota: Petters Company, Inc., Case No. 08–45257; Petters Group Worldwide, LLC, Case No. 08–45258; PC Funding, LLC, Case No. 08–45326; Thousand Lakes, LLC, Case No. 08–45327; SPF Funding, LLC, Case No. 08–45328; PL Ltd., Inc., Case No. 08–45329; Edge One, LLC, Case No. 08–45330; MGC Finance, Inc., Case No. 08–45331; PAC Funding, LLC, Case No. 08–

45371; and Palm Beach Finance Holdings, Inc. f/k/a Petters Capital, Inc., Case No. 08–45392. Joint Statement at 33, n. 11.

**8.** The PGW case was later substantively consolidated with the rest of Petters Bankruptcy Cases. Joint Statement, ¶ 264.

**9.** The Order Confirming Chapter 11 Plan can be found at ECF Number 44 in the PBF Main Case.

through which (1) the Palm Beach Liquidating Trusts were created; and (2) the Plaintiff became the liquidating trustee of the Palm Beach Liquidating Trusts. All assets, including causes of action, were transferred to the Plaintiff on behalf of the Liquidating Trusts. *Id.* at ¶ 233.

## V. The adversary proceeding now before the Court

On September 29, 2012, the Plaintiff, in his capacity as capacity as Liquidating Trustee for the Palm Beach Liquidating Trusts, instituted the above-captioned adversary proceeding by filing the *Complaint* (ECF No. 1) against GECC, which the Plaintiff amended on December 21, 2012. *See Am. Compl.* (ECF No. 26). On August 23, 2013, the Court granted in part and denied in part GECC's *Motion to Dismiss* (ECF No. 32). *See Order Dismissing Case* (ECF No. 56). In the Order Dismissing Case, the Court dismissed all but one of the Plaintiff's nine causes of action.

The single cause of action to survive the Motion to Dismiss is Count I—conspiracy to commit fraud. The Plaintiff's conspiracy to commit fraud claim alleges that GECC gained knowledge of the Petters Ponzi Scheme and assisted Petters in committing fraud on the Palm Beach Funds:

169. On or about October 24, 2000, GECC obtained actual knowledge of the Conspiracy and Conspiratorial Objective. Shortly thereafter, GECC entered into an agreement with Petters and Petters Capital, tacit if not explicit, for GECC to join and further the Conspiracy and the Conspiratorial Objective.

170. GECC would remain silent about it discovery of the Conspiracy and assist in its continued fraudulent concealment. Petters would cause GECC to be paid from new, defrauded lenders rather than from the proceeds of legitimate operations. GECC would receive not only the monies which were owed to it (i.e., principal, interest and certain fees), but also additional monies which were not: the unearned Final Success Fee.

172. GECC joined the Conspiracy so it could get paid and then retain what it received. GECC had an extraordinary economic motivation for this: in excess of $45 million.

*Am. Compl.* ¶¶ 169–72. The Plaintiff alleges that GECC knowingly assisted, furthered, encouraged and concealed Petters' fraud by, among other things:

(a) Failing to retract or correct the Recommendation Letter;

(b) Knowingly permitting its name to be used in furtherance of the Conspiracy;

(c) Demanding and accepting the entire Final Payment in an atypical and improper manner;

(d) Retaining all unearned Success Fees, including the Final Success Fee;

(e) Failing to disclose the Conspiracy to anyone, including but not limited to Petters' investors, law enforcement, or Costco;

(f) Failing to take legal or other public action against Petters or Petters Capital;

(g) Deferring any actions based on Petters and Petters Capitals' representations that GECC would get paid the Final Payment;

(h) Releasing the Petters Capital stock pledge;

(i) Failing to advise anyone about the Fraudulent Checks;

(j) Communicating the January 30th Audit Letter Response;

(k) Concealing the Fraudulent Checks from Ernst & Young;

(l) Knowingly paving the way for the Palm Beach Funds to use the same SPE

that GECC had used in its dealing with Petters;

(m) Causing the termination of the GECC Financing Statement in 2003;

(n) Authorizing Petters Capital to act as its agent for purposes of terminating the GECC Financing Statement;

(o) Failing to make disclosures to applicable regulators; and

(p) Violating its Integrity Policies, Internal Policies, and industry standards. Am. Compl. ¶ 171. Finally, the Plaintiff alleges that "[a]s a result of the Conspiracy, and GECC's joinder thereof, and the actions and inactions committed by Petters and Petters Capital ... and GECC ... in furtherance of the Conspiracy, the Palm Beach Funds were damaged in excess of $1 Billion." Am. Compl. ¶ 173.

The Plaintiff chose not to file a second amended complaint, despite being given the opportunity to do so. GECC filed an *Answer* (ECF No. 63) on December 18, 2013, which it amended on January 22, 2014. *See Amended Answer* (ECF No. 68). On September 26, 2016, the Plaintiff and GECC filed their respective Motions for Summary Judgment.[10]

## CONCLUSIONS OF LAW

### I. GECC's Motion for Summary Judgment

■ GECC argues in its Motion for Summary Judgment that the Plaintiff lacks standing [11] to pursue a claim for conspiracy to the commit fraud against GECC.[12] More particularly, GECC argues that the Plaintiff, as a creditor of the Petters Entities, lacks standing to bring the conspiracy claim against GECC because the conspiracy claim is a general claim

---

10. Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "When deciding summary judgment, the Court may look to materials in the record such as depositions, documents, affidavits or declarations, and admissions." *Certain Interested Underwriters at Lloyd's, London v. AXA Equitable Life Ins. Co.*, 981 F.Supp.2d 1302, 1305–06 (S.D. Fla. 2013) (*citing* Fed. R. Civ. P. 56(c)). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Diaz v. Amerijet Int'l, Inc.*, 872 F.Supp.2d 1365, 1368 (S.D. Fla. 2012) (*quoting Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013). Finally, the moving party "always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314–15 (11th Cir. 2011).

11. As one of the cases cited by GECC points out, "standing" is not precisely the correct term. "[W]hether a claim belongs to a bankruptcy trustee or a creditor is a question on the merits rather than one of standing because it asks whether Congress has given a trustee 'authority' to pursue a certain kind of action." *Gecker v. Gen. Elec. Capital Corp.*, No. 14 C 8447, 2015 WL 5086398, at *6 (N.D. Ill. July 27, 2015). However, the parties here use the term standing, and the use of the term standing rather than authority makes no substantive difference to the Court's analysis.

12. GECC's Motion for Summary Judgment contains three separate grounds for relief: (I) the Plaintiff lacks standing; (II) GECC did not joint any conspiracy; and (III) the Plaintiff is barred from recovery by the doctrine of *in pari delicto*. GECC, however, opted not to pursue the second two grounds. *See Notice of Withdrawal of Sections II and III* (ECF No. 539).

which could be brought against GECC by any creditor of the Petters Entities and that as a result, it is a claim which can be brought *only* by Trustee Kelley on behalf of all of the creditors of the Petters Entities in his capacity as trustee in the Petters Bankruptcy Cases. The Court disagrees.

GECC cites several recently-decided cases which appear to stand for the proposition that a creditor of a bankrupt entity lacks individual standing to sue a third party for a generalized injury that is common to all creditors. *See Ritchie Capital Mgmt. L.L.C. v. Opportunity Fin., L.L.C. ("Ritchie v. Opportunity Fin."),* 2015 WL 787747 (Minn. Dist. Ct. Jan. 15, 2015); *Gecker v. Gen. Elec. Capital Corp. ("Gecker"),* No. 14 C 8447, 2015 WL 5086398 (N.D. Ill. July 27, 2015); *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp. ("Ritchie v. GECC"),* 121 F.Supp.3d 321 (S.D.N.Y. 2015), *aff'd,* 821 F.3d 349 (2d Cir. 2016); *Greenpond S., LLC v. Gen. Elec. Capital Corp. ("Greenpond"),* 886 N.W.2d 649, 651 (Minn. Ct. App. 2016), *review granted* (Jan. 17, 2017). These cases, however, misconstrue a bankruptcy trustee's role and fail to address the lack of statutory authority permitting a bankruptcy trustee to bring a cause of action on behalf of a debtor's creditors.

Pursuant to § 701(a)(1) of the Bankruptcy Code, a bankruptcy trustee has authority to "collect and reduce to money the property of the estate for which such trustee serves." The decisions regarding "standing" cited by GECC accordingly begin their discussions by reciting the Bankruptcy Code's definition of "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case" and noting that "[o]nce the bankruptcy petition has been filed, property rights belonging to a debtor under state law become assets of the estate." *See Gecker,* 2015 WL 5086398, at *6; *Ritchie v. GECC,* 121 F.Supp.3d at 333; *Greenpond,* 886 N.W.2d at 655. This of course includes causes of action held by the debtor as of the commencement of the case. The decisions then state, correctly, that the bankruptcy trustee has exclusive standing to assert causes of action belonging to the estate. *See Gecker,* 2015 WL 5086398, at *6; *Ritchie v. GECC,* 121 F.Supp.3d at 333; *Greenpond,* 886 N.W.2d at 655. However, these decisions then promptly ignore a crucial portion of the definition—that the interest must be "of the debtor" such that the interest belongs to the estate.

Instead, when deciding whether the creditor or the bankruptcy trustee has standing to sue a third party for an injury that is not necessarily particular to that creditor, the decisions spend the vast majority of their discussions distinguishing between general/derivative claims and personal claims of creditors. For example, the *Greenpond* decision explains:

State law determines the "nature and extent" of the Petters bankruptcy estate's interest in the claims brought by Greenpond; in other words, state law controls whether Greenpond's claims are direct or derivative.... If Greenpond's claims are derivative, they belong exclusively to the bankruptcy estate.... When a claim can be brought by the bankruptcy estate, "the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *In re Emoral, Inc.,* 740 F.3d 875, 879 (3d Cir. 2014). Within the context of shareholder litigation, Minnesota courts, in determining whether a shareholder's claim is direct or derivative, have focused the inquiry to "whether the complained-of injury was an injury to the shareholder directly, or to the corporation." *Wessin v.*

*Archives Corp.,* 592 N.W.2d 460, 464 (Minn. 1999). "Where the injury is to the corporation, and only indirectly harms the shareholder, the claim must be pursued as a ·derivative claim." *Id.* The Minnesota Supreme Court has applied the concept of distinguishing between direct and derivative claims outside of traditional shareholder litigation to claims of fraud brought by a debtholder arising out of a relationship with a bank that was placed in receivership. *See Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche,* 535 N.W.2d 612, 617 (Minn. 1995) (noting, in its determination that debtholder's fraud claims were direct, rather than derivative of bank's claims, that "Minnesota has long adhered to the general principle that an individual shareholder may not assert a cause of action that belongs to the corporation"). In *Northwest Racquet,* the supreme court suggested that one method for distinguishing between· direct and derivative claims "is to consider whether the injury to the individual plaintiff is separate and distinct from the injury to other persons in a similar situation as the plaintiff." *Id.* at 617. In determining whether a claim is direct or derivative, we look to the injury itself, rather than the legal theory in which it is couched. *Wessin,* 592 N.W.2d at 464.

*Greenpond,* 886 N.W.2d at 655–56. However, the distinction of whether the claim at issue is general or personal is irrelevant if the debtor never actually held the claim at issue prior to filing for bankruptcy and thus, the claim never became property of the debtor's estate. In such cases. § 541 cannot be used to pull *any* claim belonging to creditors—general or personal—into a debtor's bankruptcy estate.

Occasionally, it is argued that § 544(a), the so-called "strong arm" provision, provides a bankruptcy trustee with the authority to step in and pursue claims on behalf of creditors. The United States Bankruptcy Court for the Northern District of Georgia addressed this argument in *In re Harman* when third party defendants who were sued by the chapter 7 trustee asserted that the trustee lacked " 'standing' . . . because the U.S. Supreme Court in *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 428–34, 92 S.Ct. 1678, 1685–88, 32 L.Ed.2d 195 (1972) held that a bankruptcy trustee does not have authority to prosecute a cause of action that Debtor could not have brought himself." *Gordon v. Harman (In re Harman),* 520 B.R. 906, 909 (Bankr. N.D. Ga. 2014). Particularly, the defendants argued that because the injury alleged by the plaintiff-trustee was to the debtor's creditors, rather than the debtor itself, the trustee had no authority to prosecute the claim. *Id.* Agreeing with the defendants that the trustee did not have authority to bring the claims, the *Harman* court explained:

In *Caplin,* the Supreme Court was asked to determine whether a trustee under Chapter X of the Bankruptcy Act of 1898 could assert claims of misconduct against an indenture trustee on behalf of Debtor's debenture creditors. 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) . . . . After Debtor filed for reorganization under Chapter X, the Chapter X trustee determined that the indenture trustee had failed to fulfill its obligations under the indenture, and brought suit. After a thorough review of a trustee's role in Chapter X reorganizations, the Supreme Court determined that the Chapter X trustee did not have standing to assert creditors' claims against the third party indenture trustee. In so ruling, the Supreme Court relied on three observations: (1) "nowhere in the statutory scheme" is the Chapter X trustee given the authority to sue on behalf of third party creditors;

(2) the suit would not serve any purpose to the reorganization, because, assuming the suit were successful, the indenture trustee would simply be subrogated to the claims of the debenture holders; and (3) a suit on behalf of the debenture holders may be inconsistent with the independent actions of the debenture holders against the indenture trustee. The third consideration raises a number of concerns—would creditors be bound by the result of the suit? Shouldn't creditors be allowed to "make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation[?]" *Id.* at 428–32, 92 S.Ct. 1678.

Subsequent courts have disagreed as to whether the reasoning in *Caplin* precludes a trustee from asserting claims generalized to all creditors. *See, e.g., Koch Refining v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1348–49 (7th Cir. 1987) (trustee is the proper party to bring a generalized claim); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688 (2d Cir. 1989) (if a generalized claim, with no particularized injury, could be brought by any creditor of debtor, trustee is the proper person to assert that claim, and creditors are bound by the outcome of trustee's action); *but see, Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118–120 (2d Cir. 1991) ("It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."); *In re Ozark Restaurant Equip. Co.,* 816 F.2d 1222 (8th Cir. 1987). The 11th Circuit has acknowledged the differing analyses, but apparently has not reached the issue itself. *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 986 (11th Cir. 1990) (noting that the bankruptcy trustee was "admit-

tedly ... asserting claims of a specific group" of the debtor's creditors arid explicitly restricting the holding to the specific facts of that case).

. . .

While acknowledging the difficulty of the question presented, *Caplin* holds that Plaintiff would not have had the statutory authority to raise the cause of action on behalf of Debtor's creditors under the Bankruptcy Act of 1898. "*Nowhere* in the statutory scheme is there any suggestion that the trustee ... is to assume the responsibility of suing third parties on behalf of debenture holders." *Caplin,* 406 U.S. at 428, 92 S.Ct. 1678. Subsequent courts, including the 11th Circuit, have concluded that the statutory authority on which Plaintiff now relies—11 U.S.C. § 544(a)—was embodied in the statutory scheme at the time of *Caplin. E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979 (11th Cir. 1990) ("*Caplin* has been held to remain the law under the revised bankruptcy statutes."), citing *In re Ozark Restaurant Equip. Co.,* 816 F.2d 1222 (8th Cir. 1987) ("Congress consolidated former sections 70c and 70e of the Act (11 U.S.C. §§ 110(c), (e) of former title 11) into Sections 544(a) and (b) of the Code, respectively.") . . . .

It is difficult to envision how the current form of § 544(a)(1) confers Plaintiff with the power to bring a claim on behalf of Debtor's creditors where Section 70c did not. Courts have also placed import on the fact that Section 544(c), as proposed in the Bankruptcy Reform Act of 1978, would have explicitly overruled *Caplin,* but that subsection was deleted prior to enactment. *See, e.g., Ozark Restaurant Equip. Co.,* 816 F.2d at 1228, n. 9.

*In re Harman,* 520 B.R. at 909–12. Based on this reasoning, the *Harman* court held that "despite Trustee's argument that the

claim is a general claim a trustee should be able to pursue, Trustee lacks the statutory authority to pursue a claim, whether generalized or particularized, on behalf of Debtor's creditors." *Id.* at 912.

Other courts which have judiciously considered the issue have ruled similarly. The United States District Court for the Western District of North Carolina, for example, acknowledged that there is a sound policy behind the idea of allowing a bankruptcy trustee to bring "general" claims on behalf of a debtor's creditors, but ultimately ruled that there is simply no statutory authority for allowing a bankruptcy trustee to do so:

> There is a common-sense concern that drives these decisions. They reason that the Trustee must have authority to pursue causes of action that injure the creditors generally, because otherwise individual creditors will rush to pursue the action and receive judgments, thereby circumventing the equality of distribution among creditors that is so fundamental to the bankruptcy scheme; in order to avoid this result, these courts reason that the trustee (not individual creditors) should have standing to pursue such claims. . . .

For several reasons, this Court believes that the Trustee's argument must be rejected. First, and most fundamentally, neither the language or the (discernible) legislative intent of § 544 supports the Trustee's contention that § 544 empowers him to bring any cause of action that may benefit the creditors. Rather, an examination of the statutory language and commentary indicates that the purpose of § 544 is to confer a *status* on the Trustee. By its terms, § 544 confers on the trustee the status of an individual meeting the description set forth in § 544(a)(1)–(3); nothing in the section indicates that it makes the trustee an agent for the creditors—the essence of the Trustee's argument in this case. And the clear import of the statutory language is confirmed by the general thrust of the discussion of § 544 offered by one well-respected treatise which indicates that § 544 is intended to give the trustee the powers and rights that a creditor meeting the description set forth § 544(a)(1)–(3) would have under state law so that the trustee can void transfers of the debtor's property or pursue any other remedies accorded to such persons under the controlling state law. *See* 4 Collier on Bankruptcy, ¶ 544.01–.03 . . . Those cases holding that the trustee cannot bring claims on behalf of the creditors are more consistent with the statutory language and (discernible) legislative intent of the section, *see Ozark Restaurant*, 816 F.2d at 1229, and this Court finds that reasoning persuasive. . . .

*Sigmon v. Miller-Sharpe, Inc. (In re Miller)*, 197 B.R. 810, 814–15 (W.D.N.C. 1996).[13] The United States District Court

---

**13.** The *Miller* court also stated its belief that neither *Koch Refining v. Farmers Union Cent. Exchg., Inc.*, 831 F.2d 1339 (7th Cir. 1987) nor *St. Paul Fire v. PepsiCo, Inc.*, 884 F.2d 688 (2nd Cir. 1989) are good law:

> The Court finds the broad view of the trustee's powers advanced in *Koch* . . . has been eviscerated by the Court's later opinion in *Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994), where the Seventh Circuit, cited *Caplin* . . . and held that the trustee for the debtor . . . did not have standing to assert an action on behalf of a creditor (the pension fund) noting that the distinction between "personal" and "general" claims offered in *Koch* . . . "is not an illuminating usage" *id.* at 893, a sentiment with which this Court wholeheartedly agrees.

*In re Miller*, 197 B.R. at 813 n. 4 (similarly noting its belief that the *St. Paul Fire* decision is not good law in footnote 5). It is worth noting here that most of the recent cases cited

for the Middle District of Georgia likewise recognized that "[a]lthough other circuits have recognized that § 544 may provide a way for a trustee to assert certain types of claims on behalf of all creditors, the Eleventh Circuit has not" and that "the Eleventh Circuit noted that such an approach ... is 'tenuous at best.'" *Flatau v. Johnson (In re Stewart)*, 339 B.R. 524, 528 n. 5 (M.D. Ga. 2006) (*citing E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 986–87 (11th Cir. 1990)). More recently, the United States District Court for the Southern District of New York, after noting that the trustee "concedes, as he must, that *Caplin* and its progeny in this Circuit ... stand squarely for the proposition that a ... bankruptcy trustee lacks standing to pursue creditor claims," explicitly held that such proposition applies not only to § 541 but also to § 544(a) and that § 544(a) thus does not provide a distinct source of standing to pursue pre-petition creditor claims. *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 92–94 (S.D.N.Y. 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013); *see also Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (holding that a trustee lacked standing because "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation"); *Steinberg v. Buczynski*, 40 F.3d 890, 892–93 (7th Cir. 1994) (Posner, J.) (holding that "[w]hen a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party ... [h]e has no interest in the suit"); *Welt v. EfloorTrade, LLC (In re Phoenix Diversified Inv. Corp.)*, 439 B.R. 231, 238 (Bankr. S.D. Fla. 2010) (J. Kimball) (noting that in general, a trustee

has no standing to sue third parties on behalf of a debtor's creditors). Indeed, most courts to critically consider the issue only "recognize two categories of lawsuits that a trustee may bring: (1) those brought by the trustee as successor to the debtor's interest in the estate under § 541 and (2) those brought under one or more of the trustee's avoiding powers." *Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 667 (Bankr. D. Md. 2016) (internal citation omitted). A cause of action, whether general or person, belonging to a debtor's creditors does not fit into either of these categories.

The Eleventh Circuit Court of Appeals addressed a similar issue in *O'Halloran v. First Union Nat. Bank of Florida*, in which a bankruptcy trustee brought actions in tort against a bank, at which a debtor maintained an account, for allegedly aiding and abetting the debtor in perpetration of a Ponzi scheme. 350 F.3d 1197 (11th Cir. 2003). The Eleventh Circuit noted that the trustee "is not the right party to pursue any damages resulting from the Ponzi scheme itself," explaining:

Even if phrases such as "sham corporation" or "alter ego" were never used in the complaint to describe [debtor], the complaint does pervasively describe [debtor] as an organization run by Payne for the sole purpose of perpetrating his Ponzi scheme.... [T]here is little doubt that the complaint alleges [debtor] to be one of the principal culprits in the Ponzi scheme. Thus, neither [debtor] nor its bankruptcy trustee can sue anyone, including the defendant, for the Ponzi scheme torts. [Debtor], whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to

by GECC rely, either directly or indirectly on the *Koch* decision. *See Greenpond*, 886

N.W.2d at 655; *Gecker*, 2015 WL 5086398, at *6–7; *Ritchie v. GECC*, 121 F.Supp.3d at 335.

have suffered injury from the scheme it perpetrated[.]

*O'Halloran,* 350 F.3d at 1202–03.

Finally, allowing a bankruptcy trustee to bring a cause of action against a third party on behalf of a debtor's creditors would likely insulate that party from liability for its alleged wrongdoing based on the defense of *in pari delicto,* which "bars the trustee from benefitting from the debtor's misconduct because the trustee is considered a wrongdoer." *In re Pearlman,* 472 B.R. 115, 120 (Bankr. M.D. Fla.), *aff'd,* 478 B.R. 448 (M.D. Fla. 2012). "[W]hen a debtor is sued in tort, a trustee acts on behalf of the debtor and is charged with all of the debtor's wrongdoing." *Id.*

■ Based on the case law discussed above, the Court holds that a debtor's bankruptcy trustee has no standing or authority under the Bankruptcy Code, particularly under either 11 U.S.C. §§ 541 or 544(a), to pursue a cause of action against a third party when the third party's alleged conduct harmed the creditors of the debtor but did not harm the debtor itself. In such a case, because the debtor was not harmed by the third party's conduct, the cause of action was not property of the debtor prior to filing for bankruptcy and thus never became property of the debtor's bankruptcy estate. Instead, the creditors that were allegedly harmed by the third party's conduct are the only parties which possess standing to pursue the cause of action, even if the cause of action is a so-called "general" cause of action common to all creditors or to a class of creditors. The Bankruptcy Code simply provides no authority which would allow a bankruptcy trustee to commandeer such a cause of action.

■ Here, GECC's alleged conduct did not injure the Petters Entities; it allegedly injured the Palm Beach Funds. A debtor which existed as a sham corporation "cannot suffer injury and, accordingly, a trustee standing in the shoes of that corporation lacks standing to sue" third parties which participated in the fraud because such claim never belonged to the debtor and thus does not belong to the debtor's estate. *In re Phoenix Diversified Inv. Corp.,* 439 B.R. at 240; *see also O'Halloran,* 350 F.3d at 1203 (noting that a debtor "whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated"); *In re Abell,* 549 B.R. at 667 (noting that the debtor "as an alleged co-conspirator, would not be able to maintain a cause of action for civil conspiracy and name either himself or a co-conspirator as a defendant" (internal citation omitted)). The Petters Entities were operated as sham corporations with the sole purpose of perpetuating the Petters Ponzi Scheme. GECC allegedly conspired with Petters and the Petters Entities and in doing so, allegedly injured the Palm Beach Funds, which are creditors of the Petters Entities. Accordingly, the Petters Entities themselves never possessed a conspiracy claim against GECC which would have become part of the Petters Entities' bankruptcy estate, and as a result, Trustee Kelley does not have exclusive standing, and may not have standing at all, to pursue such a claim against GECC. As a result, the Plaintiff, as the Palm Beach Funds' bankruptcy trustee, has standing to pursue the conspiracy claim against GECC, which claim became property of the Palm Beach Funds' bankruptcy estate upon their bankruptcy filing.

## II. The Plaintiff's Motion for Summary Judgment

The Plaintiff's Motion for Summary Judgment requests that the Court grant partial summary judgment in its favor on three issues: (1) that there is no genuine

issue of material fact that the underlying fraudulent conspiracy occurred; (2) that GECC is bound by the preclusive effect of the PBF Authority Order, defined below, in that GECC is precluded from relitigating the issue of whether Petters and Petters Capital committed common law fraud (the "Underlying Tort") on the Palm Beach Funds causing damages of $651,742,675.00, constituting 100% of their cash-on-cash fraud losses; and (3) that some of GECC's Affirmative Defenses fail as a matter of law. The Court will address each of these issues separately.

## A. Factual disputes remain as to the occurrence of the underlying fraudulent conspiracy

In order to succeed on his claim against GECC for civil conspiracy to commit fraud, the Plaintiff must prove both that a conspiracy to commit fraud occurred and that GECC was part of the conspiracy. The Plaintiff alleges that the underlying conspiracy to commit fraud here is the Petters Ponzi Scheme and that it is undisputed that the Petters Ponzi Scheme occurred. GECC, however, contends that the concept of such an all-encompassing fraudulent conspiracy as the Petters Ponzi Scheme is factually disputed and that it is the Plaintiff's burden to prove, among other things, the nature, objective, and scope of the alleged conspiracy. The Court agrees with GECC that the undisputed facts do not establish precisely what underlying conspiracy in which GECC participated and do not establish the nature, objective, and scope of the alleged underlying conspiracy. These issues are factual matters for the trier of fact to determine at trial.

## B. The preclusive effect the PBF Authority Order

On April 22, 2009, the Palm Beach Funds filed proofs of claim in each of the Petters Bankruptcy Cases (the "PBF POCs"). In the PBF POCs, the Palm Beach Funds alleged that Peters and Petters Capital defrauded the Palm Beach Funds pursuant to a scheme to defraud. On January 19, 2016, the Plaintiff, in the PBF Main Case and in his capacity as the Palm Beach Funds' trustee, filed a *Motion for Authority with Respect to the Chapter 11 Plan of Liquidation for Petters Company, Inc. et al.* (the "Motion for Authority") (Case No. 09–36379–BKC–PGH, ECF No 2810). Through the Motion for Authority, the Plaintiff sought the Court's approval for him to enter into a settlement in which he consented to the allowance in the Petters Bankruptcy Cases of the PBF POCs in the full amount of the Palm Beach Funds' cash-on-cash losses. The Court held an evidentiary hearing on the Motion for Authority on February 24, 2016, which GECC attended and at which the Plaintiff presented evidence in support of the Motion for Authority. Thereafter, on March 4, 2016, the Court entered an Order Granting the Motion for Authority with Respect to the Chapter 11 *Plan of Liquidation for Petters Company, Inc. et al.* (the "PBF Authority Order") (Case No. 09–36379, ECF No. 2862). The PBF Authority Order contained findings of fact and conclusions of law related to the proposed settlement and the Plaintiff's authority to enter into it.

The Plaintiff argues that the doctrine of issue preclusion applies so as to preclude GECC from challenging the fact that the Underlying Tort occurred, which was, according to the Plaintiff, conclusively established by the PBF Authority Order. GECC asserts that the PBF Authority Order does not have preclusive effect as to GECC and that even if it did, numerous elements of the Underlying Tort were not established

by the PBF Authority Order.[14] The Court agrees with GECC.

■ Collateral estoppel or "issue preclusion ... bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 2171, 171 L.Ed.2d 155 (2008) (internal citations and quotation marks omitted).[15] By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," issue preclusion protects against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. U.S.*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The Eleventh Circuit Court of Appeals has recited the elements of issue preclusion as follows:

> [I]ssue preclusion arises in a second action on the basis of a prior decision when the same "issue" is involved in both actions; the issue was "actually litigated" in the first action, after a full and fair opportunity for litigation; the issue was "actually decided" in the first action, by a disposition that is sufficiently "final," "on the merits," and "valid"; it was necessary to decide the issue in disposing of the first action, and—in some decisions—the issue occupied a high position in the logical hierarchy of abstract legal rules applied in the first action; the latter litigation is between the same parties or involves nonparties

that are subject to the finding effect or benefit of the first action; the role of the issue in the second action was foreseeable in the first action, or it occupies a high position in the logical hierarchy of abstract legal rules applied in the second action; and there are no special considerations of fairness, relative judicial authority, changes of law, or the like, that warrant remission of the ordinary rules of preclusion

*Gjellum v. City of Birmingham, Ala.*, 829 F.2d 1056, 1059 n. 4 (11th Cir. 1987) (internal citation omitted).

■ "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit. The application of ... issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. at 892–93, 128 S.Ct. at 2171, 171 L.Ed.2d (2008) (*quoting Richards v. Jefferson County*, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996)). In the same vein, the Supreme Court has cautioned that it may be unfair if the party against whom issue preclusion is used did not have the incentive to litigate the issue fully in the first proceeding even if he was a party to that proceeding. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979); *see also Matter of Raiford*, 695 F.2d 521, 524 (11th Cir. 1983). This problem arises most often in the context of offensive issue preclusion—where a plaintiff seeks to use issue preclusion to estop a defendant from relitigating

---

14. The Court agrees that even if the PBF Authority Order were to be given preclusive effect, the PBF Authority Order does not establish that the Underlying Tort occurred. A detailed discussion of this conclusion, however, is unnecessary as the Court finds that the PBF Authority Order is not entitled to preclusive effect here.

15. "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S.Ct. 2161, 2171, 171 L.Ed.2d 155 (2008)

a certain issue. For instance, "[i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable." *Id.* Although the Supreme Court has stopped short of banning the use of offensive issue preclusion because of its potential for unfairness, the Supreme Court has stated that "trial courts [have] broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. at 651, 58 L.Ed.2d 552; *see also Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1170 (5th Cir. 1981) (stressing "the importance of fairness in the particular circumstances of a given case when a litigant sought to invoke offensive collateral estoppel"); *Fried v. Stiefel Labs., Inc.*, No. 11-20853-CIV, 2013 WL 12063938, at *2 (S.D. Fla. Sept. 3, 2013) (noting that the actual decision of whether to apply collateral estoppel involves equitable considerations and is left to the discretion of the district court).

Here, GECC simply had no incentive to litigate with respect to the Motion for Authority, and the Plaintiff's use of the PBF Authority Order as a basis for issue preclusion in this adversary proceeding was not foreseeable. In the Motion for Authority, the Plaintiff sought authority to enter into a settlement with Trustee Kelley and several other Petters-related parties to resolve disputes related to the Petters Bankruptcy Cases. Although GECC appeared at the hearing, GECC had no incentive to oppose or otherwise litigate the Plaintiff's entitlement to enter into a settlement which would allow the Plaintiff to recover funds from other parties on behalf of the Palm Beach Funds' estate. GECC was not on notice that the Plaintiff would seek to use any findings of fact and conclusions of law obtained in connection with the Motion for Authority against GECC in this adversary proceeding, and

such use was not foreseeable. Moreover, it would be unfair under these circumstances and in a case in which GECC is potentially liable for hundreds of millions of dollars in damages to allow the Plaintiff to use offensive issue preclusion in order to assign preclusive effect to the PBF Authority Order, with respect to which GECC did not stand to gain or lose anything. For this reason and without addressing the remaining elements of issue preclusion, the Court will exercise its discretion and decline to assign preclusive effect to the PBF Authority Order in the context of this adversary proceeding. Accordingly, the Court will not grant summary judgment to the Plaintiff on the issue that it has been conclusively determined that the Underlying Tort occurred.

## C. GECC's Affirmative Defenses

The Plaintiff argues that because the PBF Authority Order preclusively establishes that the Underlying Tort occurred, GECC's Second, Third, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses must be conclusively rejected. For the reasons discussed in the preceding section, the Court does not assign preclusive effect to the PBF Authority Order. The Plaintiff also argues that GECC's First, Second, Fourth, Seventh, Eight, and Ninth Affirmative Defenses fail as a matter of law. The Court finds no reason to reject or overrule GECC's Affirmative Defenses at this stage in the proceedings. Accordingly, the Court will not grant summary judgment to the Plaintiff as to any of GECC's Affirmative Defenses.

## III. Conclusion

For the reasons discussed in detail above, the Court finds that neither party is entitled to summary judgment. The Court finds that: (1) the Plaintiff has standing to pursue the conspiracy cause of action

against GECC; (2) the undisputed facts do not establish the nature, objective, and scope of the alleged underlying conspiracy; (3) it is appropriate to exercise discretion and decline to assign preclusive effect to the PBF Authority Order in order to preclude GECC from challenging the occurrence and nature of the Underlying Tort; and (4) there is no basis for rejecting or overruling GECC's Affirmative Defenses at this stage in the proceedings.

## ORDER

The Court, being fully advised in the premises and for the reasons discussed in detail above, hereby **ORDERS AND ADJUDGES** that:

1. The Plaintiff's *Motion for Partial Summary Judgment* (ECF No. 509) is **DENIED**.
2. GECC's *Motion for Summary Judgment* (ECF No. 510) is **DENIED**.

**ORDERED in the Southern District of Florida on June 15, 2017.**

